UNITED STATES DISTRICT COURT   FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
EMILE MARK DIXON,          :
                       :
     Plaintiff,           :     MEMORANDUM
                       :     AND ORDER
      - against -         :
                       :     05-CV-3127 (JG)
MICHAEL ZENK,           :
                       :
     Defendant.         :
-------------------------------------------------------------- X

A P P E A R A N C E S :

EMILE MARK DIXON
  Inmate No. 06411-041
  United States Penitentiary, Big Sandy
  PO Box 2068
  Inez, Kentucky  41224
  Plaintiff, *Pro Se*

BENTON J. CAMPBELL
  United States Attorney
  Eastern District of New York
  271 Cadman Plaza East, 7th Floor
  Brooklyn, New York 11201
 By: Gail A. Matthews
  Attorney for Defendant Michael Zenk

JOHN GLEESON, United States District Judge:

    Emile Mark Dixon, a federal prisoner, brought this *pro se* action for money damages against five current and former employees of the Federal Bureau of Prisons ("BOP"), in their individual and official capacities, pursuant to the principles of *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Dixon claimed the defendants violated his rights under the Due Process Clause of the Fifth Amendment by (a) wrongfully detaining him in the Special Housing Unit ("SHU") of the Metropolitan Detention Center in Brooklyn, New York ("MDC") and (b) not allowing him to be heard to protest that

1

placement. In a memorandum and order dated August 20, 2007, I dismissed all of the claims in this action except the claim that MDC Warden Michael Zenk denied Dixon a post-deprivation hearing between May 12, 2002 and his release from the SHU on October 1, 2003. Zenk now moves pursuant to Fed. R. Civ. P. 56 for summary judgment on that claim. For the reasons stated below, the defendant's motion is granted.

BACKGROUND

The facts are presented in the light most favorable to the plaintiff.[1] On April 16, 2001, Dixon was incarcerated at the MDC awaiting trial. He was placed in the SHU upon his arrival at the MDC because of the nature of the pending charges against him, which included a charge of murder of a witness. Def.'s Rule 56.1 Statement ¶ 6; Def.'s Ex. B. He was released to the general population on May 14, 2001, where he remained until October 22, 2001, when he was placed back in the SHU pending an investigation for assaulting another person. On November 20, 2001, he was released to the general population, but was transferred to the SHU on January 6, 2002 for one day because he received an Incident Report for refusing to obey an order and for being insolent toward the staff. And on March 2, 2002, he was placed in the SHU for four days. Def.'s Rule 56.1 Statement ¶ 6; Def.'s Ex. C.[2]

On April 8, 2002, the government formally notified the court in Dixon's pending criminal case that it would seek the death penalty against him. On April 9, 2002, Dixon was classified as requiring administrative detention, and he was transferred back to the SHU. Def.'s Rule 56.1 Statement ¶ 7; Def.'s Ex. D. The April 9, 2002 detention order characterized Dixon

---

[1] Plaintiff did not submit a Rule 56.1 Counter Statement, but I will include the facts as he presented them in his opposition and in his complaint.
[2] The reason for the March 2, 2002 placement in the SHU is not clear from the record, but that placement is not challenged in this action.

as "high security status" based on the fact that he was facing the death penalty. Def's Ex. D, E. On October 1, 2003, about eighteen months later, Dixon was released from SHU confinement.

On April 12, 2002, three days after Dixon was placed in administrative detention, Lieutenant D. Ortiz conducted a record review and concluded that Dixon should continue in special housing. Def.'s Ex. E. On April 16, 2002, Dixon appeared before Captain S. LoPresti for a special housing review, and LoPresti continued Dixon's housing in the SHU. *Id.* On April 23, April 30, and May 7, 2002, Ortiz conducted record reviews of Dixon's administrative detention and each time determined that Dixon should remain in the SHU. *Id.* Also on May 7, 2002, MDC psychologist Florence Tam saw Dixon for a routine 30-day mental status evaluation in light of his placement in the SHU. Def.'s Ex. F. She conducted a psychological review of Dixon, and concluded that the risk of self-harm and potential for harm to others was "low." Furthermore, Tam concluded that Dixon's mental status was stable and unremarkable. *Id.*

On May 9, 2002, Dixon appeared before LoPresti for a monthly formal review, and LoPresti concluded that Dixon should remain in the SHU. Def's Ex. E. On May 14, 2002, May 21, 2002, May 28, 2002, and June 4, 2002, Ortiz conducted record reviews of Dixon's placement in the SHU, and decided to continue Dixon's housing in the SHU. *Id.* On June 6, 2002, MDC psychologist Lisa Hope evaluated Dixon and concluded that the risk of self-harm was low, as was the potential for harm to others. Def.'s Ex. F.

On June 8, 2002, Dixon appeared before LoPresti for his monthly formal review. Def.'s Ex. E. LoPresti reviewed Dixon's status in Administrative Detention and continued his placement. *Id.* On June 10, 2002, Warden Zenk responded to a letter request from Dixon's attorney to reconsider Dixon's placement. Def.'s Ex. G. Zenk stated that it was within his discretion to place Dixon in administrative detention based on his status as a capital defendant.

Def.'s Ex. G. He notified counsel of Dixon's right to appeal his decision through the Inmate Administrative Remedy Request program through which Dixon may request reconsideration of Zenk's decision. *Id.* He further informed counsel that if Dixon was not satisfied with Zenk's decision, he could appeal the decision to the Bureau of Prisons' Northeast Regional Director, and ultimately to the Bureau's Office of General Counsel. *Id.*

Dixon alleges that from the outset, he complained both formally and informally about his placement in the SHU. Pl.'s Mem. Opp. 2. Specifically, Dixon refers to his May 28, 2002 Inmate Request for Informal Resolution where he challenged his placement in the SHU. *See* Compl. Ex. In a May 29, 2002 Request for Administrative Remedy submitted to Warden Zenk, Dixon requested that he be transferred back to housing in the general population; he contended the only reason prison officials deemed him a security risk was because he was facing capital punishment. *Id.* He further noted that prior to being placed in the SHU, he had been in general population for an entire year without posing a risk. He argued that his placement in the SHU was in violation of his rights and privileges, for he was being subjected to the same treatment as inmates who had violated BOP policies. Finally, he asserted that he was being denied access to his lawyer, family, and an adequate law library.

In a letter dated June 14, 2002, Zenk denied Dixon's request to be moved to the general population, stating that it was within his discretion to place Dixon in administrative detention based on his status as a capital defendant. *Id.* Zenk also advised Dixon that he would continue to receive weekly and monthly SHU reviews as well as monthly psychological reviews, and that if it became apparent through these reviews that general population housing would be more appropriate, Zenk would transfer Dixon. *Id.*

4

Dixon appealed this decision to the BOP Regional Director, and the Regional Director denied his appeal, confirming Zenk's decision to continue Dixon's administrative detention.[3] *Id.* The weekly record reviews, monthly formal reviews and monthly psychological reviews continued to take place with no change in Dixon's status or psychological assessments.[4] Def.'s Ex. E, F. In his complaint, Dixon states that he was not afforded a hearing; and that any contact he had with the prison officials was not meaningful. Additionally, he claims (and the defendant does not dispute) that his psychiatric consults occurred through his cell door.

On November 1, 2002, Dixon's case manager submitted a memorandum recommending continued placement in the SHU based on the following facts: Dixon was charged with a leadership role of a drug organization; he was death penalty certified; he had already been transferred to the SHU for other infractions in January 2002 and October 2001; and he had several prior convictions, including a violent felony. Def.'s Ex. H.

On November 11, 2002, Dixon received an Incident Report because he refused to obey an order of a staff member who had directed Dixon to turn around in order to be handcuffed. Def.'s Rule 56.1 Statement ¶ 51. Brought before the Unit Disciplinary Committee, Dixon was sanctioned to 180 days loss of telephone privileges. Also on November 11, 2002,

---

[3] Dixon states that he has exhausted his administrative remedies with respect to this claim by appealing to the Office of General Counsel, and the defendant does not contend otherwise.

[4] In 2002, record reviews were conducted on June 11, June 15, June 18, June 22, June 25, June 29, July 6, July 13, July 20, July 27, August 3, August 9, August 15, August 22 (no signature), August 29 (no signature), September 16, September 23, September 30, October 16, October 23, October 30, November 6, November 15, November 22, November 29, December 6, December 16, December 23, and December 30 . In 2003, record reviews were conducted on January 6, January 16, January 23, January 30, February 6, February 16, February 23, March 2, March 16, April 17, April 24, May 1, May 10, May 17, May 24, June 3, June 4, June 7, July 14, July 21, July 28, August 10, August 17, August 24, September 10, September 17, and September 24. Def.'s Ex. E.

Formal monthly reviews conducted by LoPresti took place on July 8, 2002, August 8, 2002, September 8, 2002, October 9, 2002, November 9, 2002, December 9, 2002, January 9, 2003, February 9, 2003, March 9, 2003, April 10, 2003, June 3, 2003, August 3, 2003, September 3, 2003, September 24, 2003. Def.'s Ex. E.

Psychological reviews were conducted on a monthly basis on July 6, 2002, August 2, 2002, August 30, 2002, October 28, 2002, November 25, 2002, December 20, 2002, February 14, 2003, March 14, 2003, May 9, 2003, June 6, 2003, July 3, 2003. August 2, 2003. Def.'s Ex. F.

Dixon received a second Incident Report for assaulting an officer by throwing a cup of clear liquid at the officer's face when he opened Dixon's food slot. Dixon appeared before a Discipline Hearing Officer on November 25, 2002 who sanctioned him to a loss of 27 days of good time credit, as well as disciplinary segregation from November 25, 2002 to December 24, 2002. Def.'s Rule 56.1 Statement ¶ 51; Def's Ex. J.

On October 1, 2003, Dixon was released from the SHU because Zenk believed that less secure housing was appropriate. Def.'s Rule 56.1 Statement ¶ 100, 104. At the time, his criminal trial had not yet occurred. He was subsequently tried and sentenced to life in prison.

## DISCUSSION

A.  *The Summary Judgment Standard of Review*

Under Federal Rule of Civil Procedure 56(c), a moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994) ("[T]he burden is on the moving party to demonstrate that no genuine issue respecting any material fact exists." (citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975))).

A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion."

*Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (*per curiam*), and *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989)). Therefore, although a court "should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods. Co.*, 530 U.S. 133, 151 (2000).

However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is proper when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo*, 22 F.3d at 1223-24 (citations omitted).

B.   *SHU Placement and Post-Deprivation Hearing Rights*

Prison officials must be "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 521 (1979). Section 541.22(a) of Title 28 of the Code of Federal Regulations bestows upon the warden the power to place a new inmate in administrative detention pending classification or when the inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates or to the security or orderly running of the institution. Administrative detention as confinement in a special unit serves to remove the inmate from the general population. 28 CFR § 541.10. For pre-trial detainees who are placed in the SHU, detention cannot be for punitive reasons; rather, administrative detention must be rationally related to a legitimate government objective, such as preventing the inmate from harming others or from conducting dangerous activity in prison. *Basciano v. Lindsay*, 530 F. Supp. 2d 435, 448 (2008).

7

While administrative detention is usually only for short periods of time, 28 C.F.R. § 541.23, when there are security or complex investigative concerns, an inmate can be held in administrative detention until the security or investigative concerns cease to exist. *United States v. McTier*, No. 05-CR-401 (ILG), 2006 WL 2707622 (E.D.N.Y. July 20, 2006). When placing an inmate in administrative detention, however, the warden must prepare an administrative detention order detailing the reasons for the placement. A copy must be given to the inmate within 24 hours of his placement. 28 C.F.R. § 541.22(b). Then, a Segregation Review Officer (the "SRO") must conduct a record review within 3 work days of the inmate's placement; he must hold a hearing and formally review the status of the inmate if the inmate spends 7 continuous days in the SHU. Thereafter, the officer must review the case on the record (in the inmate's absence) each week and hold a hearing and review the case formally at least every thirty days. The inmate must appear for the hearing unless he waives his right to do so in a signed writing. 28 C.F.R. § 541.22(c).

Additionally, for inmates held in the SHU for longer than 30 days, a psychiatric or psychological assessment including a personal interview must be conducted by a member of the staff. The evaluation -- which addresses the inmate's ability to adjust to his surroundings as well as the potential for harm to himself or others -- is then submitted to the SRO in a written report. For extended SHU detentions, these psychological assessments must occur once a month. 28 C.F.R. 541.22(c).

C.      *Compliance with the Code of Federal Regulations*

Dixon alleges that once he was placed in the SHU, he complained "formally and informally" about his SHU designation. The sole allegation to survive the government's motion to dismiss is his claim that the detention in the SHU "violated [his] liberty interest and

procedural due process rights" because the BOP failed to provide the post-deprivation hearings to which he was entitled. Compl. 3.

Having spent about eighteen months in the SHU, Dixon is correct that he has a liberty interest in not being confined in the SHU for such a length of time. *See Iqbal v. Hasty*, 490 F.3d 143, 152 (2d Cir. 2007) ("Pretrial detainees need not show that an imposed restraint imposes atypical and significant hardships to state deprivation of a liberty interest protected by procedural due process.").

Dixon, however, was afforded procedural protections to safeguard his due process rights, as set out in the relevant code regulations. These protections include the weekly record reports by the assigned lieutenant, the monthly hearings before LoPresti, and the monthly psychological reviews conducted by the staff psychologists. The code provisions "reflect the observations in *Bell v. Wolfish* . . . [and] embody the procedures which must be resorted to in determining whether assignment of these defendants to the SHU was for the purpose of punishment rather than for some other legitimate purpose and provide the administrative process for challenging that assignment." *McTier*, 2006 WL 2707622, at *2.

Zenk has supplied the Court with an extensive record of the BOP's efforts to comply with the regulations. Specifically, in compliance with CFR § 541.22(a), an Administrative Detention Order dated April 9, 2002 was issued by BOP Lieutenant M. Wilkins. The order stated that Dixon was placed in administrative detention due to his "high security status" and indicates that Dixon received a copy of the order on April 9, 2002, as witnessed by staff member A. Holt, in accordance with C.F.R. § 541.22(b). Def.'s Ex. D. Furthermore, in compliance with C.F.R. § 541.22(c), a record review was conducted by Ortiz on April 12, 2002, within three days of Dixon's placement in administrative detention. And almost every week and

9

every thirty days thereafter, record reviews were conducted. The defendant has also provided documentation that Dixon was seen on a monthly basis by a prison psychologist.

Dixon "disputes the veracity of the affidavits presented by the Defendant," and he contends that "some if not all the attachments . . . of the sworn affidavits have been falsified." Pl.'s Mem. Opp. 2. He further asserts that he was not accorded the hearings due him pursuant to CFR § 541.22(c). He states that only a handful of interviews were actually conducted, and the ones that did take place were not conducted in a meaningful manner so as to qualify as a "hearing" within the meaning of the regulations. *Id.*

Assertions that the affidavits and exhibits were falsified are not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991) ("[D]efendants' bald assertion, completely unsupported by evidence, did not satisfy their burden; it certainly did not present a sufficient disagreement to require submission to a jury as required by Fed. R. Civ. P. 56(c)." (internal quotation marks and brackets omitted)). Furthermore, Dixon's allegations that Zenk did not provide him with the process required by the regulations are belied by statements in Dixon's complaint, where he references the officials' visits and reviews. *See* Compl. at 8 ("[Zenk] [c]onstantly denied my request not only to return to general population . . . This was done both orally and in writing again and again, whenever the warden made his weekly visits and I inquired about my situation, the only response I would receive is that my status remains the same.")

Furthermore, Dixon suggests that the alleged violations of BOP regulations constitute a due process violation. He claims, for example, that his psychological assessments were conducted through the cell door in violation of 28 C.F.R. 541.22(c)(1), which requires that

10

the "[s]taff shall conduct a psychiatric or psychological assessment, including a personal interview, when administrative detention continues beyond 30 days."

The government argues that nothing in the applicable regulation requires the MDC to conduct the "personal interview" on the same side of the cell door as plaintiff. While this is one possible interpretation of the regulation,[5] such a strained reading of the regulation is not necessary to a determination that Dixon's due process rights were not violated. "[T]he mere enactment of a state or prison regulation does not necessarily create a protected liberty interest for prisoners." *Schmelzer v. Norfleet*, 903 F. Supp. 632, 634 (S.D.N.Y. 1995) (citing *Sandin v. Conner*, 515 U.S. 472 (1995)). A regulation that gives rise to a constitutionally protected liberty interest does not also set the standard for determining the amount of process mandated by the Constitution. *Tellier v. Scott*, No. 94-CV-3459 (KMW), 2004 WL 224499, at *5 (S.D.N.Y. Feb. 5, 2004). Due process requires that Dixon receive notice of the reasons for his placement in the SHU and that he be provided with an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation (in writing or otherwise). *Id.* Furthermore, due process "requires that prison officials engage in periodic reviews of the continuing appropriateness of confinement in administrative detention." *Id.* (citing *Hewitt v. Helms*, 459 U.S. 460 (1983). Dixon has received all of these procedural

---

[5] In *McTier*, the court refrained from determining whether the "hearing" requirement of § 541.22(c) would be satisfied by a "hearing" held behind the glass of the inmate's cell. Judge Glasser wrote that he has found no

> definitive determination of what satisfies the "hearing" requirement of § 541.22(c). Should the word be given its dictionary meaning, cognizant of the caution to be used in 'making a fortress out of the dictionary,' *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945), or should the world be understood in the context and in the reality of the circumstances in which the 'hearing' is to be held . . . ?"

2006 WL 2707622, at *6.

protections and more. He has not offered any evidence that calls into question the adequacy of the reviews or hearings as mechanisms to safeguard his procedural rights.

## CONCLUSION

Even when the evidence is viewed in the light most favorable to Dixon, he fails to make out a claim that his due process rights were violated. Zenk has presented evidence that Dixon was afforded the procedural protections prescribed by the regulations. To the extent that Dixon has attempted to create a genuine issue of material fact by asserting that the documents have been falsified, he has failed; he has not presented any evidence that casts a shadow on the veracity of defendant's submissions. Accordingly, defendant's motion for summary judgment is granted. [6]

So ordered.

John Gleeson, U.S.D.J.

Dated: June 16, 2008
　　　Brooklyn, New York

---

[6] In light of this determination, I need not address defendant's alternative argument of qualified immunity.